UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHAEL D. VICKER, On Behalf of Himself and All Others Similarly Situated, | Civ. No. 04 30040-MAP |
| Plaintiff, | CLASS ACTION |
| vs. | COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| WAVE SYSTEMS CORPORATION, JOHN E. BAGALAY, JR., STEVEN K. SPRAGUE and GERARD T. FEENEY, | DEMAND FOR JURY TRIAL |
| Defendants. | |

## SUMMARY AND OVERVIEW

1.  This is a securities class action on behalf of all purchasers of the common stock of Wave Systems Corporation ("Wave" or the "Company") between July 31, 2003 and February 2, 2004 (the "Class Period"), against Wave and certain of its officers and directors for violations of the Securities Exchange Act of 1934 (the "1934 Act").

2.  Wave creates technologies and services to secure and sell digital information. The Company's EMBASSY technology is a hardware and software-based device that enables secure transaction processing and distributed information metering in users' personal computers.

3.  On December 18, 2003, the Company issued a press release in which it announced that the Securities and Exchange Commission ("SEC") was investigating certain public statements made by Wave in August 2003, as well as certain insider selling that occurred around the same time.

4.  The true facts, which were known by each of the defendants, but concealed from the investing public during the Class Period, were as follows:

(a)   That the Company's IBM announcement dated August 4, 2003 would result in no direct revenue to the Company;

(b)   That the Company's Intel announcement dated July 31, 2003 was immaterial and would not generate any revenue to the Company until 2004, if ever;

(c)   That the so-called Intel contract did not require Intel to purchase even one piece of software; and

(d)   That the number of Trusted Platform Module ("TPM")-enabled motherboards shipped over the course of 2003 and 2004 would be *de minimis*.

5.   As a result of the defendants' false statements, Wave stock traded at inflated levels during the Class Period, increasing to as high as $4.53 per share on August 5, 2003, whereby the Company and the Company's top officers and directors sold more than $8.6 million worth of their own shares.

## JURISDICTION AND VENUE

6.   Jurisdiction is conferred by § 27 of the 1934 Act. The claims asserted herein arise under §§ 10(b) and 20(a) of the 1934 Act and Rule 10b-5.

7.   Venue is proper in this District pursuant to § 27 of the 1934 Act. Many of the acts giving rise to the violations complained of, including the dissemination of false and misleading public statements and financial information, occurred in this District.

8.   The Company's principal executive offices are in Lee, Massachusetts, where the day-to-day operations of the Company are directed and managed.

9.   In connection with the wrongs alleged herein, Defendants used the instrumentalities of interstate commerce, including the United States mails, interstate wire and telephone facilities, and the facilities of the national securities markets.

## THE PARTIES

10. Plaintiff Michael D. Vicker purchased Wave common stock as described in the attached certification and was damaged thereby.

11. Defendant Wave creates technologies and services to secure and sell digital information. The Company's EMBASSY technology is a hardware- and software-based device that enables secure transaction processing and distributed information metering in users' personal computers.

12. Defendant John E. Bagalay, Jr. ("Bagalay") was, during the Class Period, and at all times relevant hereto, the Chairman of Wave.

13. Defendant Steven K. Sprague ("Sprague") was, during the Class Period, and at all times relevant hereto, the President and Chief Executive Officer of Wave. During the Class Period, Sprague sold more than $1.0 million worth of his Wave stock.

14. Defendant Gerard T. Feeney ("Feeney") was, during the Class Period, and at all times relevant hereto, the Senior Vice President of Finance and Administration, CFO and Secretary of Wave. During the Class Period, Feeney sold more than $500,000 worth of his Wave stock.

15. The individuals named as defendants in ¶¶ 12-14 are referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Wave's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to

them but not to the public, each of these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

16. Plaintiff brings this action as a class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure , individually and on behalf of all persons or entities who purchased Wave common stock (the "Class") during the period from July 31, 2003 and February 2, 2004 and were damaged thereby. Excluded from the Class are defendants, the affiliates, the subsidiaries of Wave and any officers or directors of Wave or its affiliates or subsidiaries, any members of the immediate families of Individual Defendants, any entity controlled by any excluded person, and the heirs, executors, successors, and assigns of any excluded person (the "Class").

17. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Wave had more than 63 million shares of stock outstanding, owned by hundreds if not thousands of persons.

18. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

    (a)    Whether the 1934 Act was violated by defendants;

    (b)    Whether defendants omitted and/or misrepresented material facts;

(c) Whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) Whether defendants knew or deliberately disregarded that their statements were false and misleading;

(e) Whether the price of Wave common stock was artificially inflated; and

(f) The extent of damage sustained by Class members and the appropriate measure of damages.

19. Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

20. Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

21. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## SUBSTANTIVE ALLEGATIONS

### Background

22. Wave was incorporated in Delaware in August of 1988 under the name of Indata Corp., and changed its name to Cryptologics International, Inc. in December of 1989 before it settled on the name of Wave Systems Corp. in January of 1993. The Company made its initial public offering on August 31, 1994 at a price to the public of $5.00 per share. Until October 3, 1997, the Company's stock traded on The Nasdaq National Market tier of the Nasdaq. From October 3, 1997 to October 24, 1997, the stock traded on the Nasdaq Small Cap market before being delisted from the exchange for not meeting minimum listing requirements. By year-end 1997, the Company had burned through some $48 million, and the December balance sheet

showed a total of $758,000 in cash and a working capital deficit of some $600,000. KPMG Peat Marwick noted a "going concern" risk in their independent auditor's report.

23. The Company managed to raise enough money to keep going by issuing stock and convertible securities in small increments through the end of 1997 and early 1998. The Company raised $800,000 by issuing 800,000 shares of stock and 160,000 warrants to six accredited investors in a private placement in September 1997. In October 1997, the Company raised an additional $2.25 million by issuing 112,500 shares of convertible stock to another investor. In March of 1998, the Company raised another $3 million by issuing more convertible stock.

24. The Internet stock boom came along at the perfect time, and Wave caught it in full swing in March of 1999, when it was able to sell just over 2 million shares at $11 per share to a group of institutional investors, raising $23 million. This financing alleviated any danger of running out of cash in the short term. The Company was relisted on the Nasdaq, and began trading again on April 6, 1999, closing that day at $23.50 per share. However, in July 2003, the Company's share price had plummeted to less than $1, and with that drop, the Company's officers lost their ability to raise any capital for the Company or to profit through insider selling. The defendants then formulated a scheme to re-inflate the Company's shares by associating the Company "publicly" with two of the World's biggest technology companies –Intel and IBM. Defendants believed that this alliance would trick the public into believing that the Company had new lifelines which would infuse profits into the Company via agreements with these companies. With the "appearance" of two new separate revenue streams, defendants sought to, and did, raise monies via a private placement to keep the Company on life support in addition to pocketing over $1.5 million in insider trading proceeds.

## SCIENTER

25. In addition to the above-described involvement, each Individual Defendant had knowledge of Wave's problems and was motivated to conceal such problems. Feeney, as CFO, was responsible for financial reporting and communications with the market. Many of the internal reports showing Wave's forecasted and actual growth were prepared by the finance department under Feeney's direction. Defendant Sprague, as CEO and President, was responsible for the financial results and press releases issued by the Company on July 31, 2003 and August 4, 2003. Each Individual Defendant sought to demonstrate that he could lead the Company successfully and generate the growth expected by the market.

26. Defendants were motivated to engage in the fraudulent practices alleged herein in order to obtain financing for the Company.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

27. Each defendant is liable for making false statements, or failing to disclose adverse facts known to him about Wave. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Wave common stock was a success, as it (i) deceived the investing public regarding Wave's prospects and business; (ii) artificially inflated the price of Wave common stock; (iii) raised $7.1 million via a private placement offering via the sale of the Company's artificially inflated shares; (iv) allowed defendants to arrange to sell and actually sell in excess of $1.5 million worth of Wave shares at artificially inflated prices; and (v) caused plaintiff and other members of the Class to purchase Wave common stock at inflated prices.

## DEFENDANTS' FALSE AND MISLEADING
## STATEMENTS ISSUED DURING THE CLASS PERIOD

28.  On July 31, 2003, the Company issued a press release entitled "Wave Systems Announcement." The press release stated in part:

> Wave Systems Corp. announced an agreement today with Intel Corporation that will help enable both companies to accelerate the development and deployment of trusted applications and services for safer computing on personal computer platforms.
>
> The agreement will enable Intel to bundle Wave's software and services with a future Intel desktop motherboard, targeted for trusted computing platforms.
>
> "Wave helps fill a critical requirement for trusted computing services," said Michelle Johnston, acting director of marketing for Intel Desktop Board Operations. "We believe the EMBASSY® Trust Suite software will provide good value for our customers looking for trusted computing applications."
>
> "Wave has been working closely with Intel on the development of application and service solutions," said Brian Berger, senior vice president, Global Business Development, Wave Systems. "Both companies believe that in order to accelerate adoption in the marketplace, it is critical to identify and offer an attractive introductory set of services and high value applications. We are delighted to be working with Intel by providing solutions for this emerging market.
>
> "Wave believes that a portfolio of services will make trusted computing an important part of the personal computing market going forward. It is our job, to work with industry leaders like Intel, to help identify and develop those services that will bring the most value to the enterprise – as trusted hardware is deployed and a more secure computing environment becomes a reality," Berger said.

29.  On August 4, 2003, the Company issued a press release entitled "Wave Systems Makes Enterprise Applications More Secure Than Ever; IBM's Independent Software Vendor (ISV) Program Helps Wave Systems Create More Secure Applications for the Enterprise User." The press release stated in part:

> Wave Systems Corp. today announced that the new Document Manager Vault and SmartSignature security software applications in Wave's EMBASSY® Trust Suite client software family *work with* the IBM Embedded Security

Subsystem, a hardware and software-based security solution available on select ThinkPad notebooks and ThinkCentre desktops, to create more secure applications for the business user.

The compatibility of Wave's security software applications with IBM's hardware and software security solution is a result of Wave's successful participation in IBM's Independent Software Vendor program. This partnership is another example of IBM's commitment to help independent software vendors use IBM's hardware and software-based security system to make computing as secure as possible for the end-user. "The early stages of any emerging market are critical. IBM has clearly established their leadership in trusted computing with their family of Embedded Security System personal computers," said Lark Allen, executive vice president, Wave Systems. "Wave's partnership with IBM will significantly help us in our objective to deliver open and interoperable solutions to business customers as trusted computing continues to evolve." Leveraging the IBM security chip for personal computers, the Wave EMBASSY Trust Suite Client Business Edition includes the first of many new applications aimed at business users: Wave's Document Manager Vault and SmartSignature. Wave's EMBASSY Trust Suite represents one of the first portfolios of user software applications, administrative tools, and trust-based systems developed specifically around the new Trusted Computing Group (TCG) specification.

Wave's Document Manager Vault application offers a user-controlled vault for storage of private data, such as encrypted files and folders on personal computers. Document Manager Vault offers the choice of a simple drag-and-drop mechanism, as well as a set of integrated plug-ins for popular office tools to encrypt and decrypt any type of file on a local PC. *By using IBM's Embedded Security Subsystem in conjunction with Document Manager Vault, sensitive data is protected even if the PC is lost or stolen.*

30. On August 5, 2003, defendant Feeney sold 100,000 Wave shares at $5.00 per share for proceeds of $500,000, cutting his share ownership by 50%.

31. On August 6, 2003, defendant Sprague sold 150,000 Wave shares at $3.14-$3.47 per share for proceeds of $492,636, cutting his share ownership by 20%.

32. On November 13, 2003, the Company issued a press release entitled "Wave Systems Provides Update on Corporate Progress and Reviews Q3/Nine Months Results." The press release stated in part:

Wave Systems Corp., a leader in delivering trusted computing applications and services with advanced products, infrastructure and solutions across multiple

trusted platforms, today reported results for its third quarter and nine month ended September 30, 2003 and reviewed significant recent corporate developments.

* * *

***Steven Sprague, Wave's president and CEO, said, "We can now clearly see the growing momentum for trusted computing in the marketplace, and we expect substantial growth in volumes over the course of the next four quarters.***

"Wave has clearly focused in establishing technological and market leadership in this space as a services and infrastructure provider. We have delivered products that are easy to install, easy to configure, easy to use and are what business users really need.

"We continue to add functionality and capability to the EMBASSY® Trust Suite tapping into Wave's expertise in building trusted computing services and infrastructure and responding to the needs of the marketplace. Wave's ETS works seamlessly on all six Trusted Computing Group-compliant, commercially available platforms today. We are now focusing on delivering to the market a portfolio of powerful client and server software solutions that we expect will give IT managers exceptional life cycle management capabilities and impressive cost-of-ownership results."

33. On November 19, 2003, with the Company's shares inflated, the Company issued a press release entitled "Wave Systems Completes $7.1 Million Private Placement Financing." The press release stated in part:

Wave Systems Corp., a leading developer of trusted computing solutions and services, announced today that it has completed a $7.1 million private placement of Class A common stock and warrants with a group of institutional and accredited investors. ***The financing is intended to fund Wave Systems' ongoing operations, specifically its sales and marketing efforts, as well as its engineering, development and customer support teams and its general corporate overhead.***

The private placement consists of 3,725,263 shares of common stock priced at $1.90 per share as well as warrants to purchase 1,095,227 shares of the company's common stock at an exercise price of $2.62 per share. If exercised in their entirety, the warrants would generate an additional $2.9 million in gross proceeds to Wave. J. P. Carey Securities acted as the agent for the private placement.

34. On December 18, 2003, the Company issued a press release entitled "Wave Systems Notified of SEC Investigation." The press release stated in part:

- 10 -

> Wave Systems Corp. today reported that the Securities and Exchange Commission has commenced a formal investigation into certain matters relating to Wave. The SEC's investigative order, received by Wave on December 17, 2003, relates to certain public statements made by Wave during and around August 2003, as well as certain trading in Wave's securities during such time.

35. Between January 12, 2004 and January 14, 2004, defendant Sprague sold 307,500 Wave shares at $1.70-$1.80 per share for proceeds of $528,875.

36. The true facts, which were known by each of the defendants, but concealed from the investing public during the Class Period, were as follows:

(a) That the Company's IBM announcement dated August 4, 2003 would result in no direct revenue to the Company;

(b) That the Company's Intel announcement dated July 31, 2003 was actually immaterial and would not generate any revenue to the Company over the following two quarters, if ever;

(c) That the so-called Intel contract did not require Intel to purchase even one piece of software; and

(d) That the number of TPM-enabled motherboards shipped over the course of 2003 and 2004 would be *de minimis*.

## NO SAFE HARBOR

37. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded

- 11 -

herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Wave who knew that those statements were false when made.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

38.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

39.   During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

40.   Defendants violated § 10(b) of the 1934 Act and Rule 10b-5 in that they:

    (a)   Employed devices, schemes, and artifices to defraud;

    (b)   Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    (c)   Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Wave common stock during the Class Period.

41. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Wave common stock. Plaintiff and the Class would not have purchased Wave common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

42. As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Wave common stock during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

43. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

44. The Individual Defendants acted as controlling persons of Wave within the meaning of § 20(a) of the 1934 Act. By reason of their positions as officers and/or directors of Wave, and their ownership of Wave stock, the Individual Defendants had the power and authority to cause Wave to engage in the wrongful conduct complained of herein. Wave controlled each of the Individual Defendants and all of its employees. By reason of such conduct, the Individual Defendants and Wave are liable pursuant to § 20(a) of the 1934 Act.

**WHEREFORE**, plaintiff prays for judgment as follows:

A. Declaring this action to be a proper class action pursuant to FRCP 23;

B. Awarding plaintiff and the members of the Class damages, interest and costs;

C. Awarding such equitable/injunctive or other relief as the Court may deem just and proper; and

D. Awarding attorney's fees and costs.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury.

DATED: February 20, 2004

By his attorneys,

**SHAPIRO HABER & URMY LLP**

*/s/ Theodore Hess-Mahan*

Theodore Hess-Mahan (BBO#557109)
75 State Street
Boston, MA 02109
Tel: (617) 439-3939
Fax: (617) 439-0134

**GOODKIND LABATON RUDOFF & SUCHAROW LLP**
Jonathan M. Plasse
Christopher J. Keller
100 Park Avenue
New York, New York 10017
Tel: (212) 907-0700
Fax: (212) 818-0477

::ODMA\PCDOCS\GLRSNY1\502314\1

## CERTIFICATION

I, __Michael D. Vicker__, hereby certify as follows:

1. I am fully authorized to enter into and execute this Certification. I have reviewed a complaint prepared against Wave Systems Corporation ("Wave Systems") alleging violations of the federal securities laws and I authorized the filing of this complaint;

2. I did not purchase securities of Wave Systems at the direction of counsel or in order to participate in any private action under the federal securities laws;

3. I am willing to serve as a lead plaintiff in this matter, including providing testimony at deposition and trial, if necessary;

4. I have transactions in the securities of Wave Systems as reflected in Exhibit A hereto;

5. I have not sought to serve as a lead plaintiff in any class action under the federal securities laws during the last three years, except for the following:


6. Beyond my pro rata share of any recovery, I will not accept payment for serving as a lead plaintiff on behalf of the class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct.

Dated: __2-18-2004__                                    _____

## EXHIBIT A

### TRANSACTIONS IN WAVE SYSTEMS CORPORATION

| TRANSACTION (Purchase/Sale) | TRADE DATE (mm/dd/yyyy) | PRICE (per share) | NO. OF SHARES | TOTAL COST/ PROCEEDS |
|---|---|---|---|---|
| Buy | 9-9-2003 | $3.33 | 3000 | $6667.00 |
| Sell | 2-11-2004 | $1.58 | 3000 | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Additional Transactions: